UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| ADVANCED APPLICATIONS SPECIALISTS, INC. | CIVIL ACTION |
| VERSUS | |
| ASPEN SPECIALTY INSURANCE COMPANY | NO. 23-01413-BAJ-RLB |

## RULING AND ORDER

Before the Court are Cross Motions for Summary Judgment from Defendant Aspen Specialty Insurance Company ("Defendant" or "Aspen") (Doc. 49), and Plaintiff Advanced Applications Specialists, Inc. ("Plaintiff" or "AAS") (Doc. 50). Both Motions are opposed (Doc. 56; Doc. 54). The Parties filed Replies. (Doc. 61; Doc 59-1). The Court re-opened discovery solely to allow the Parties to depose a witness, John Adams ("Adams"), and ordered supplemental briefing. (*See* Doc. 97). The Parties filed Supplements and Replies. (Docs. 108, 111, 112, 117). For the following reasons, Defendant's Motion will be **GRANTED** and Plaintiff's Motion will be **DENIED**.

## I. BACKGROUND

This case arises out of Defendant's denial of coverage to Plaintiff under a commercial general liability insurance policy. Plaintiff alleges Defendant wrongfully denied coverage for Plaintiff's claim relating to damage to the copper tubes of a condenser Plaintiff was contracted to work on for Shintech Louisiana, LLC ("Shintech") in November 2022, despite Defendant allegedly receiving satisfactory proof of loss. (Doc. 6 at ¶¶ 6, 13, 16). Plaintiff alleges this constitutes a breach of

1

contract and bad faith under Louisiana law and seeks damages. (Doc. 6 at ¶¶ 31-60). Defendant counters that Plaintiff's claim was clearly excluded from the Policy and denies that its actions rise to the level of bad faith. (Doc. 49 at 1). Both Parties now seek summary judgment in their favor.

The following facts are uncontested. On or about November 10, 2022, Shintech issued a purchase order under a Master Services & Construction Contract ("MSC") it had with Plaintiff for work to address corrosion on the tube sheet of a York Refrigeration Chiller condenser owned by Shintech. (*See* Doc. 49-2 ¶ 54; Doc. 56-1 ¶ 54; Doc. 111-2 at ¶¶ 5-9; Doc. 117-1 at ¶¶ 5-9; Doc. 50-1 at ¶ 4). Shintech has engaged Plaintiff "dozens if not hundreds of times over the years" for this type of blasting and coating work. (Doc. 49-1 at ¶ 41; Doc. 56-1 at ¶ 41). In response, Plaintiff issued a quote to Shintech for coating certain components of the condenser, including the channel, channel cover, head, and tube sheets. (Doc. 56-1 at ¶¶ 15, 49). Corking, a process by which corks are inserted into the holes on the face of the tube sheet so that the blasting and coating work may commence, is not specifically mentioned in the quote. (Doc. 54-1 at ¶ 59; Doc. 60 at ¶ 59). However, as part of this type of coating work, Plaintiff uses corks to plug the holes on the tube sheet. (Doc. 56-1 at ¶ 53). For the work at issue, corks were placed into the tubes or tube sheet of the exchanger by tapping them in with a dowel. (Doc. 56-1 at ¶¶ 16-19, 23, 26). The Parties dispute whether these corks were inserted into the tubes or into the tube sheet, but the parts are adjacent. (Doc. 49-2 at ¶¶ 61-63; Doc. 56-1 at ¶¶ 61-63). Once the coating cured, the corks were removed using a drill. (Doc. 49-2 at ¶¶ 31-33; Doc. 56-1 at ¶¶ 25, 27

2

31-33). The scope of work included demobilization, which includes "packing up everything and leaving the site". (Doc. 111-2 at ¶ 31; Doc. 117-1 at ¶ 7). The work was ultimately completed by Plaintiff on November 18, 2022. (Doc. 50-1 at ¶ 11; Doc. 54-1 at ¶ 11; Doc. 49-2 at ¶ 58; Doc. 56-1 at ¶ 58). The work resulted in damage, consisting of gouging or scarring at the ends of the tubes on Shintech's condenser. (Doc. 49-2 at ¶ 70; Doc. 56-1 at ¶ 70). The damage was identified after the corks were removed. (Doc. 111-2 at ¶ 34; Doc. 117-1 at ¶ 34). The Parties dispute whether corking the tubes was included in the scope of work in the contract documents. (Doc. 117-1 at ¶ 34). Plaintiff's supervisor for the work reported that the damage was likely caused by his assistant and provided a photo of the tool that caused the damage. (Doc. 111-2 at ¶ 36; Doc. 117-1 at ¶ 36). A third party, TEAMS Industrial Service, conducted an inspection of the damage on December 5, 2022. (Doc. 50-1 at ¶ 14; Doc. 54-1 at ¶ 14). On December 16, 2022, Shintech's PVC Superintendent provided a copy of the TEAMS report to Plaintiff via email. (Doc. 50-1 at ¶ 16; Doc. 54-1 at ¶ 16). On December 20, 2022, and again on January 6, 2023, Plaintiff told its insurance broker to wait to report the occurrence to Defendant until Plaintiff received more information from Shintech "to present for claim for cost of inspection of damaged [sic] and cost to repair". (Doc. 56-1 at ¶ 83; Doc. 49-27 at 2-3). On March 14, 2023, Shintech sent a demand letter rejecting Plaintiff's defective workmanship pursuant to Articles 5.3 and 7.1 of the MSC and requested that Plaintiff remedy its defective workmanship. (Doc. 50-1 at ¶ 17; Doc. 54-1 at ¶ 17; Doc. 49-2 at ¶ 77; Doc. 56-1 at ¶ 77). In that letter, Shintech stated that the damage to the tubes was $350,007.00.

3

(Doc. 50-1 at ¶ 17; Doc. 54-1 at ¶ 17). On March 15, 2023, Plaintiff, through its broker, reported a Notice of Occurrence to Defendant for the first time. (Doc. 49-2 at ¶ 89; Doc. 56-1 at ¶ 89).

**The Policy Language**

Defendant issued Commercial General Liability & Environmental Exposures Policy No. ER00Q4J22 (the "Policy") in effect from February 1, 2022, to February 1, 2023, to Plaintiff. (Doc. 49-2 at ¶ 91; Doc. 56-1 at ¶ 91).

The Policy includes a Damage to Property Exclusion, which excludes coverage for:

> 3. Property damage or environmental damage to:
> . . .
>> e. That part of any real property on which you or any contractors or subcontractors, whether working directly or indirectly on your behalf, are performing operations, if the property damage or environmental damage arises out of those operations . . . or,
>> f. That part of any property that must be restored, repaired or replaced because your work was incorrectly performed on it.

(Doc. 49-23 at 19). Relevant to this property damage exclusion, the Policy defines "your work" as "work or operations performed by you on or on your behalf and materials, parts or equipment furnished in connection with such work or operations". (Doc. 49-23 at 45). This property damage exclusion, however, does not apply to property damage included under the "products-completed operations hazard" ("PCOH"), meaning the following is presumably covered barring other exclusions:

> OO. Products-completed operations hazard:
>> 1. Includes all bodily injury, property damage and environmental damage occurring away from premises you own or rent and arising out of your product or your work, except:

4

> a. Products that are still in your physical possession; or
>
> b. Your work that has not yet been completed or abandoned. Your work will be deemed completed at the earliest of the following times:
>
>> (i) When all of your work called for in your contract has been completed;
>>
>> . . .
>>
>> (iii) When that part of your work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

(Doc. 49-23 at 43). The Policy also has a "Your Work" exclusion, which excludes coverage for:

> Property damage to your work arising out of it or any part it and included in the products-completed operations hazard.
>
> This Exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

(Doc. 49-23 at 21). The Policy also includes a Professional Services Exclusion, which provides that: "this insurance does not apply to any liability arising out of the insured's rendering of or failure to render any professional services." (Doc. 49-23 at 66). Professional Services are further defined as:

> [S]ervices the insured performs for a third party for a fee, but only in the capacity as an architect, engineer, landscape architect, land surveyor or planner, construction manager, LEED accredited professional, interior designer/space planner, or as otherwise specifically noted in a Professional Service Endorsement attached to and made part of this Policy.

(Doc. 49-23 at 43). The last provision of relevance to the instant suit is the Voluntary Payments condition, which provides:

No insured will, except at that insured's own cost, admit liability or voluntarily make a payment, assume any obligation, make any settlement or incur any expense, other than emergency response cost or crisis cost, without our prior written consent.

(Doc. 49-23 at 37).

## II.    LEGAL STANDARD

A district court should "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Funches v. Progressive Tractor & Implement Co., L.L.C.*, 905 F.3d 846, 849 (5th Cir. 2018) ("This occurs when a party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").

For issues on which the movant bears the burden of proof at trial, they "must come forward with evidence which would entitle [them] to a directed verdict if the evidence went uncontroverted at trial." *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264–65 (5th Cir. 1991). The nonmoving party can then defeat the motion by either countering with evidence establishing a genuine dispute of material fact, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

Where the nonmovant bears the burden of proof at trial, the moving party must offer evidence that undermines the nonmovant's claim or point out the absence of evidence supporting essential elements of the claim. *See Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871, 885 (1990). Once the movant shows

entitlement to judgment as a matter of law, the nonmovant must bring forward evidence to create a genuine issue of material fact. *Giles v. Gen. Elec. Co.*, 245 F.3d 474, 493 (5th Cir. 2001). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Darden v. City of Fort Worth*, 880 F.3d 722, 727 (5th Cir. 2018).

## III.    DISCUSSION

Louisiana law provides that "an insurance policy is a contract between the parties and should be construed by using the general rules of interpretation of contracts set forth in the Civil Code." *Williams v. Employers Mut. Cas. Co.*, No. CIV.A. 13-499, 2014 WL 2197067, at *2 (M.D. La. May 27, 2014). The Court's role in interpreting contracts is to determine the common intent of the parties. *Starr Surplus Lines Insurance Company v. Banner Property Management Co.*, No. CIV.A. 18-5635, 2018 WL 6448840, at *5 (E.D. La. Dec. 10, 2018) (citing La. Civ. Code art. 2045). "In doing so, Civil Code article 2047 requires that words and phrases used in an insurance policy are to be construed using their plain, ordinary and generally prevailing meaning, unless the words have acquired a technical meaning," *Id.* (citing *Henry v. South Louisiana Sugars Cooperative*, No. 2006-2764 (La. 5/22/07), 957 So.2d 1275, 1277 (citing *Cadwallader v. Allstate Ins. Co.*, No. 2002-1637 (La. 6/27/03), 848 So.2d 577, 580)). An insurance policy "constitutes the law between the insured and the insurer, and the agreement governs the nature of their relationship." *Peterson v. Schimek*, 98-1712 (La. 3/2/99), 729 So.2d 1024, 1028. "Absent a conflict with statutory provisions or public policy, insurers, like other individuals, are entitled to limit their

7

liability and to impose and to enforce reasonable conditions upon the policy obligations they contractually assume." *Louisiana Ins. Guar. Ass'n v. Interstate Fire and Cas. Co.*, 93-0911 (La. 1/14/94), 630 So.2d 759, 763. Furthermore, "when the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La. Civ. Code art. 2046 (1987). "[T]he court should not change the coverage of the policy under the guise of interpreting ambiguous language. The court should consider the policy as a whole and interpret the policy to fulfill the reasonable expectations of the parties in the light of the customs and usages of the industry. If a clause remains ambiguous after such consideration, then it should be construed against the insurer." *Trinity Indus., Inc. v. Ins. Co. of N. Am.*, 916 F.2d 267, 269 (5th Cir. 1990).

Plaintiff argues that Defendant wrongfully denied coverage of its claim, and that it did so in bad faith. (Doc. 50 at 1). Defendant argues that Plaintiff's claim for coverage was either excluded or voided by the terms of the Policy, and that this is not a bad faith case. (Doc. 49 at 1).

### A. Coverage

"[T]he party seeking coverage under an insurance policy has the burden of proving the existence of coverage[.]" *Beavers v. Hanover Ins. Co.*, 2021-0070 (La. App. 1 Cir. 10/8/21), 331 So. 3d 340, 343. The insurer "bears the burden of proving the applicability of an exclusionary clause within a policy." *Doerr v. Mobil Oil Corp.*, No. 00-0947 (La. 12/19/00), 774 So.2d 119, 124. The Policy provides coverage for "those sums that the insured becomes legally obligated to pay as damages because of bodily

8

injury or property damage that takes place during the policy period and is caused by an occurrence in the coverage territory." (Doc. 49-23 at 8). It appears undisputed that the property damage at issue, Shintech's damaged copper tubes, is an occurrence that falls within the scope of the general liability coverage offered by the Policy. (Doc. 49-2 at 8; Doc. 51-2 at 9-12). Defendant, however, argues that Plaintiff's claim is not covered because at least four exclusions in the Policy apply: the Damage to Property Exclusion, the "Your Work" exclusion, the Professional Services Exclusion, and the Voluntary Acts provision. (Doc. 54 at 1). "[A]ny single exclusion is sufficient to preclude coverage." *Hi-Port, Inc. v. Am. Int'l Specialty Lines Ins. Co.*, 22 F. Supp. 2d 596, 599 (S.D. Tex. 1997), *aff'd*, 162 F.3d 93 (5th Cir. 1998). The Court will consider each exclusion in turn.

### 1) Damage to Property Exclusion

Defendant contends that the Damage to Property Exclusion applies to Plaintiff's claim because this exclusion applies to "that part of any property that must be restored, repaired or replaced because your work was incorrectly performed on it" and "the placement and removal of the corks from the tubes," which caused the damage, was part of Plaintiff's work. (Doc. 49-1 at 16-17). Plaintiff disputes this, arguing that their "scope of work did not include any work on the parts of the property that were actually damaged, i.e. the tubes," and that they "did not perform any work on the tubes." (Doc. 51-2 at 18). Plaintiff cites a Fifth Circuit case in support of their proposition, *Essex Ins. Co. v. Hines*, but this is not quite what the court held. 358 F. App'x 596 (5th Cir. 2010). In *Essex*, the Fifth Circuit did *not* rule that the "that

particular part" language "limits the scope of the exclusion to damage to items within the scope of work," as Plaintiff contends. (Doc. 51-2 at 18). Rather, the court held that it merely limited the scope of the exclusion "to damage to parts of property that *were actually worked on* by the insured." 358 F. App'x at 598 (emphasis added). It is undisputed that Plaintiff's employee's negligence caused the damage to the tubes while removing the corks. (Doc. 51-2 at 3, 13). Whether the tubes were mentioned in the scope of work seems irrelevant because the tubes were "actually worked on" when the offending drill came into contact with them. *See Essex*, 358 F. App'x at 598. It would defy common sense to conclude otherwise. The property damage exclusion applies.

Even when these types of provisions are "inartfully drafted," courts have still concluded that they are clearly "intended to exclude coverage for the cost of restoring, repairing or replacing faulty workmanship on the part of the insured . . . specifically, to exclude 'property damage' that directly or consequentially occurs from the faulty workmanship of the insured[.]" *Advantage Homebuilding, LLC v. Maryland Cas. Co.*, 470 F.3d 1003, 1012 (10th Cir. 2006).

### a. Products-Completed Operations Hazard Exception

Plaintiff contends that even if the property damage exclusion applies, the damage at issue falls under the Products-Completed Operations Hazard ("PCOH") exception and thus is still covered. (Doc. 51-2 at 12-13). The PCOH exception provides coverage for property damage arising out of an insured's work, except for work that has not yet been completed. (Doc. 49-23 at 43). Under the Policy definition, "work will

10

be deemed completed at the earliest of the following times: (i) when all of your work called for in your contract has been completed; . . . or (iii) when that part of your work done at a job site has been put to its intended use by any person or organization other than another contractor . . . working on the same project." (*Id.*) Plaintiff argues that their work should be considered complete under the PCOH because the damage was allegedly discovered after the work was completed on November 18, 2022, or because the act that caused the damage, the cork removal process, occurred after Plaintiff's work had allegedly been "put to its intended use". (Doc. 51-2 at 14-16). Defendant disagrees, arguing that the cork removal process is an intermediary step of the work process, that the discovery date of the damage is both disputed and irrelevant to determining when the damage occurred, and that Plaintiff's work was not "put to its intended use". (Doc. 54 at 8- 9). The Court will address both arguments in turn. However, it is worth noting from the outset that the PCOH is almost certainly inapplicable here.

First, "the 'completed operations hazard' seems to be a definition, not a grant of coverage[.]" *Fireman's Fund Ins. Co. v. Sneed's Shipbuilding, Inc.,* 803 F. Supp. 2d 530, 541 (E.D. La. 2011). Secondly, a PCOH provision "seeks to include protection against bodily injury and property damage liability *arising out of operations* and also *arising out of the named insured's products.* The key words in this provision are 'arising out of,' which could mean 'but for' the damaged property the resulting incident would not have occurred." *Supreme Servs. & Specialty Co. v. Sonny Greer, Inc.,* 2006-1827 (La. 5/22/07), 958 So. 2d 634, 645. This necessarily implies that two

11

separate things must occur in order for the PCOH to apply: 1) the insured causes property damage and 2) a resulting incident arises out of the property damage. There is no such resulting incident here. Plaintiff seeks to recover costs only for the property its employee damaged. Put another way, "[u]nder the PCOH provision, damages, *other than the faulty product or work itself*, arising out of the faulty workmanship are covered by the policy." *Id.* (emphasis added). They are "designed specifically to . . . exclude coverage for defective or faulty workmanship and consequential damages arising therefrom." *W. World Ins. Co. v. Paradise Pools & Spas, Inc.,* 633 So. 2d 790, 795 (La. Ct. App. 1994). Here, Plaintiff seeks to employ the PCOH to cover its own faulty workmanship, which is not what PCOH provisions are designed to cover. "Liability policies are not performance bonds." *Breaux v. St. Paul Fire and Marine Insurance Company,* 345 So.2d 204, 208 (La.App. 3rd Cir.1977). Regardless, as outlined below, the PCOH would not apply here because Plaintiff's work was not complete when the damage occurred.

### i.    When the Damage Occurred

Plaintiff argues that this is a "construction defect" that, by law, is deemed to have occurred when the damage manifests, by which they imply means only when the damage is discovered. (Doc. 51-2 at 10). The Court disagrees. First, the use of a trigger theory, which courts typically use to determine the initial trigger for coverage "in long-term environmental damage and other complex causation cases," is not appropriate in this case. *Norfolk S. Corp. v. California Union Ins. Co.,* 2002-0369 (La. App. 1 Cir. 9/12/03), 859 So. 2d 167, 190, *writ denied,* 2003-2742 (La. 12/19/03), 861

12

So. 2d 579. The Parties do not appear to dispute that the occurrence took place within the coverage period, and as Defendant points out, trigger theories are not generally used beyond this purpose. (Doc. 54 at 11); *see id.*; 15 LA. CIV. L. TREATISE, Insurance Law & Practice § 6:5 (4th ed.).

Second, even if the Court were to use a trigger theory to determine the relevant moment of "occurrence" of the property damage, the manifestation theory is likely not the most appropriate. This is not a construction defect in the sense that Plaintiff claims. The damage to the tubes is not "something evolving gradually or manifesting itself over time," as in typical construction defects. *See, e.g., Rando v. Top Notch Props., L.L.C.,* 2003-1800 (La. App. 4 Cir. 6/2/04), 879 So. 2d 821, 827. The Court does not find the manifestation theory applicable in this case where "common sense dictates that the 'occurrence'. . . is the event which caused the property damage itself." *Alberti v. WELCO Mfg. of Texas,* 560 So.2d 964 (La.App. 4th Cir.1990). Here, the actual damage can be proven to have occurred at a specific time prior to its discovery, making an injury-in-fact theory more appropriate, if one needed to be used at all.

But even if the Court were to use the manifestation theory, "an occurrence is generally understood to mean the time and/or event when the negligence manifests itself by causing *actual damages*, rather than the commission of the causative act." *Rando v. Top Notch Props., L.L.C.,* 2003-1800 (La. App. 4 Cir. 6/2/04), 879 So. 2d 821, 827. (citing *Jackson v. Welco Mfg. Of Texas,* 612 So.2d 743, 744 (La.App. 4th Cir.1992) (emphasis added); *see also Acadia Ins. Co. v. Peerless Ins. Co.,* 679 F. Supp. 2d 229, 244 (D. Mass. 2010) ("the application of [a PCOH] exception turns on when the

13

insured actually inflicted the damage on the property."). It is not in dispute that the *actual damages* were caused when Plaintiff's employee drilled too far into the corks during the removal process, damaging the tubes. That is when the damage occurred, or manifested. That the damage was allegedly discovered at a later time does not change this. Plaintiff's reliance on the manifestation theory line of jurisprudence is misplaced.

### ii.    *Whether the Work Was Completed*

The PCOH exception applies only to damage arising out of work that is completed. Plaintiff insists that their work was completed in accordance with subsection b(iii) of the PCOH when the damage occurred. (Doc. 51-2 at 16). The Policy defines work as being complete when "that part of your work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project." (Doc. 49-23 at 43). Plaintiff argues that their work had been put to its intended use when the damage occurred because "the intended purpose of the contract was to protect against corrosion on the tube sheet . . . by applying protective coating" and "once the coating is applied[], the coated area is then protected from corrosion and put to its intended use." (Doc. 51-2 at 16). Plaintiff cites to deposition testimony from Shintech representatives that allegedly confirms this, but it does no such thing. (Doc. 51-2 at 17). The testimony merely states that the witness, whose role in creating or overseeing the scope of work is unclear, does not dispute that "the intended purpose of . . . blasting and coating is to protect against corrosion." (*Id.*) This is obvious, and irrelevant to the specific work

14

at issue here. Defendant, unsurprisingly, argues that the work had not been put to its intended use because "the coating is used to protect the exchanger from corrosion . . . while in operation" and that this could not be done once the tubes were damaged. (Doc. 54 at 9). More broadly, Defendant argues that the coating was only "one discrete step of the work" and the job could not be considered complete until after the corks were removed. (Doc. 61 at 7). The Court agrees.

"'Words and phrases used in an insurance policy should be construed using their plain, ordinary, and generally prevailing meaning, unless the words have acquired a technical meaning.' Here, 'put to its intended use' does not have a technical meaning or a policy-specific definition." *Martco Ltd. P'ship v. Wellons, Inc.*, 588 F.3d 864, 881 (5th Cir. 2009) (citing *Cadwallader,* 848 So.2d at 580; *Carbon,* 719 So.2d at 439.). In *Martco*, the court applied the "common meaning" of the phrase "put to its intended use" to find that a furnace unit was put to use when it was employed as part of the factory in which it was designed to operate. The same can be said here. Plaintiff's work had not been put to its intended use because its work was to perform coating maintenance on several parts of an operating condenser unit. (Doc. 51-2 at 2). Surely no business would contract to have corrosion repair work done for equipment that would not ultimately operate. The "by another person" modifier also seems important here to indicate that, under this provision, a job is not considered finished until it is utilized, presumably by the entity who solicited the work. Regardless of which portions of the condenser Plaintiff worked on, which the Parties still dispute, Plaintiff has pointed to no evidence that Shintech, nor any of its

15

individual employees, put the tube sheet, the tubes, or the condenser to use before the damage occurred.

In a case with a near identical PCOH provision, a court rejected a similar argument to Plaintiff's that an individual part of a larger system was "put to its intended use" while the larger system was not. *Vintage Contracting, L.L.C. v. Dixie Bldg. Material Co.*, 03-422 (La. App. 5 Cir. 9/16/03), 858 So. 2d 22. The Court finds this reasoning persuasive here.

Regardless, it is clear the damage occurred while the job was still in progress. Removal of the corks, and later demobilization, is an undisputed part of blasting and coating work. (Doc. 56-1 at ¶ 53; Doc. 111-2 at ¶ 31; Doc. 117-1 at ¶ 7). These steps occurred during or after the tubes were damaged. The PCOH exception does not apply when damage occurs before work is completed. (Doc. 49-23 at 43). The Court does not find this provision ambiguous. Here, the damage occurred before the work was completed. Thus, the PCOH exception does not apply and Plaintiff's claim falls under the damage to property exclusion of the Policy.

### 2) "Your Work" Exclusion

Even if the Court accepted Plaintiff's arguments that the tubes were not "worked on" by Plaintiff or that their work was complete when the damage occurred, which in their view would skirt the property damage exclusion, the Policy's "your work" exclusion applies here. This provision excludes coverage for "property damage to your work arising out of it or any part of it and included in the products-completed operations hazard." (Doc. 51-2 at 21). Thus, even if Plaintiff's work fell under the

16

PCOH exception, it would be excluded by this provision. "Your work" is further defined as "work or operations performed by you or on your behalf; and materials, parts or equipment furnished in connection with such work or operations." (Doc. 49-23 at 45). Plaintiff contends that this exclusion does not apply because "the tubes were never part of [Plaintiff's] contracted work." (Doc. 51-2 at 21). As discussed *supra*, the Court rejects this argument. The tubes were damaged directly by Plaintiff's employee's negligent work. (Doc. 51-2 at 3, 13). Moreover, the Fifth Circuit has ruled "the 'your work' exclusion does not confine itself to a "particular part" of certain property, or contain any other narrowing phrase that might limit its application only to defective workmanship." *Am. Home Assur. Co. v. Cat Tech L.L.C.*, 660 F.3d 216, 223 (5th Cir. 2011). This type of exclusion is "designed specifically to . . . exclude coverage for defective or faulty workmanship and consequential damages arising therefrom." *W. World Ins. Co. v. Paradise Pools & Spas, Inc.*, 633 So. 2d 790, 795 (La. Ct. App. 1994) (interpreting a "your product" exclusion that is substantially similar to the "your work" exclusion in the instant Policy). Again, "[l]iability policies are not performance bonds." *Breaux v. St. Paul Fire and Marine Insurance Company*, 345 So.2d 204, 208 (La.App. 3rd Cir.1977).

### 3) Professional Services Exclusion

The Parties dispute whether Plaintiff's work is considered professional services. (Doc. 49-1 at 13-16; Doc. 51-2 at 22 -24). Because there remain genuine issues of material fact, including whether Plaintiff has held itself out to be involved in engineering work, this issue is not appropriate for summary judgment. As noted

17

*supra*, "any single exclusion is sufficient to preclude coverage." *Hi-Port, Inc. v. Am. Int'l Specialty Lines Ins. Co.,* 22 F. Supp. 2d 596, 599 (S.D. Tex. 1997), *aff'd*, 162 F.3d 93 (5th Cir. 1998). The Court has found that two exclusions apply, thus the Court need not reach this particular dispute.

### 4) Voluntary Payments provision

Similarly, the Parties dispute whether Plaintiff admitted liability and assumed obligations to Shintech in response to the damaged tubes, voiding coverage under the voluntary payments condition. (Doc. 49-1 at 20-21; Doc. 59-1 at 12). This too remains a genuine issue of material fact, rendering this question inappropriate for summary judgment. Again, because coverage is excluded otherwise, the Court need not reach this argument.

### B. Bad Faith Claims

As Defendant points out, to the extent there is no coverage, there can be no bad faith. "Breach of contract is a condition precedent to recovery for the breach of the duty of good faith[.]" *Bayle v. Allstate Ins. Co.,* 615 F.3d 350, 363 (5th Cir. 2010); *see also Little v. USAA Cas. Ins. Co.,* 655 F.Supp.2d 625, 635 (W.D.La. 2009)("[T]he question of bad faith is pretermitted by this Court's determination that there is no coverage under the policies."). There was no breach of contract here because coverage was excluded by at least two provisions in the Policy. Thus, Defendant did not act in bad faith in denying Plaintiff's claims.

## IV.    CONCLUSION

Accordingly,

**IT IS ORDERED** Defendant's **Motion For Summary Judgment By Aspen Specialty Insurance Company (Doc. 49)** be and is hereby **GRANTED**.

**IT IS FURTHER ORDERED that** Plaintiff's **Motion For Summary Judgment Against Aspen Specialty Insurance Company (Doc. 50)** be and is hereby **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion in Limine to Limit and/or Exclude Defense Exhibits (Doc. 83) and Defendant's Motion in Limine to Exclude Certain Evidence and Testimony (Doc. 84) are **DENIED AS MOOT.**

Judgment shall issue separately.

Baton Rouge, Louisiana, this 23rd day of March, 2026

**JUDGE BRIAN A. JACKSON**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**